UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No.00-20887
_____

JOHN A. GOSSELINK; PHILLIP W. TUTT; RICHARD E. SIMMS, on behalf of
themselves individually and all others similarly situated

Plaintiffs - Appellants


VERSUS


AMERICAN TELEPHONE & TELEGRAPH, INC., formerly known as
American Telephone & Telegraph Company; Et Al

Defendants

SBC COMMUNICATIONS, INC., formerly known as Southwestern Bell
Corporation individually and as successor in interest to Bell
Systems, Inc.; SOUTHWESTERN BELL YELLOW PAGES, INC.; THE SBC
PENSION BENEFIT PLAN - BARGAINED PROGRAM

Defendants - Appellees

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

November 7, 2001

Before EMILIO M. GARZA, PARKER, and DENNIS, Circuit Judges.

ROBERT M. PARKER, CIRCUIT JUDGE:

The Plaintiffs, John Gosselink, Phillip Tutt, and Richard

Simms, on behalf of themselves and all others similarly situated

("Plaintiffs") appeal from the district court's judgment which

denied class certification, dismissed Gosselinks's claim for increased pension benefits, dismissed Gosselink's claims for declaratory and injunctive relief, and dismissed their claims against AT&T as time barred. The issue on appeal is whether the Southwestern Bell Communications Benefit Plan Committee ("Plan Committee") interpreted specific plan language in a manner that is consistent with a fair reading of the plan as a whole. Because it did, we AFFIRM.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs Gosselink, Tutt, and Simms are retired Southwestern Bell Yellow Pages ("SWBYP") directory sales representatives who currently receive pension benefits from the Southwestern Bell pension benefit plan (the "Plan"). The dispute in this case arises from language in the Plan document.

The Plan was originally adopted in 1980 by AT&T. Sponsorship was transferred for administration to Southwestern Bell Communication's ("SBC") predecessor at the time of the divestiture of the regional telephone companies by AT&T in 1984. The design of the Plan was as follows.

Job salaries for employees were assigned to "Pension Bands" numbered from 101 through 135, and a pension benefit amount was assigned to each band.[1] The Pension Bands covered the entire

---

[1]The Pension Bands were later renumbered from Pension Band 301 through Pension Brand 335.

2

salary range for Plan participants with fixed wages.  In most cases, jobs were assigned to a Pension Band based upon the annual salary of an experienced employee set for that job as of August 9, 1980.  A complete "Pension Band Conversion Table" containing the "Maximum Basic Rate of Pay for Job Titles and Classifications" was set forth in the 1980 plan.  These wage rate tables were then updated annually by AT&T, and thereafter by SBC, to reflect the general wage increase agreed upon in collective bargaining.

The Plan also included a Monthly Benefit Table which provided dollar amounts for the basic monthly pension benefit for each Pension Band.[2]  Thus, for the vast majority of employees, their monthly pension benefit could be calculated by multiplying the employee's years and months of service by the dollar amount shown in the Monthly Benefit Table for the Pension Band to which the employee's job title was assigned.

However, the Plan provided a different methodology for calculating the pension benefits for SWBYP directory sales representatives ("DSRs") because DSRs' compensation varied from year to year depending upon the commissions they earned. Under the Plan, all DSRs were assigned to Pension Band 135, the highest Pension Band.  Then, for DSRs only, a special "multiplier" was applied to the benefit shown in the Monthly Benefit Table to

---

[2]  As one would expect, the basic monthly pension benefits increased as the Pension Band numbers (and the corresponding range of salaries in the Pension Bands) increased.

3

calculate the monthly pension benefit of a particular DSR.

In fact, the multiplier was a fraction. The numerator was the average of an individual commission sales representatives's last three years of income. The denominator was the three-year average of the median maximum annual basic rate of pay related to Pension Band 135. This was also referred to as the "fixed average." Thus, an individual DSR's pension amount was calculated by multiplying the "employee's years of service" times the "Pension Band 135 Monthly Pension Amount" times the "multiplier." With respect to the pension formula for DSRs, the only dispute between the parties is how to calculate the denominator of the multiplier under the Plan language.

In 1995, Plaintiff Gosselink, a DSR, obtained a pension calculation from Southwestern Bell. Believing his calculated pension to be too low, he sought out an explanation. However, Gosselink never received an explanation to his liking. Thus, he filed an administrative complaint. SBC denied his complaint.[3] Gosselink filed further administrative appeals, which were all denied.

---

[3] In the denial letter, SBC maintained that it had calculated the denominator in the multiplier "by multiplying the median maximum annual basic rate of pay . . . plus the percentage increase in the annual based rate of pay . . . for the job rate at the midpoint of Pension Band Number 335." It further explained that the "fixed average" denominator in the multiplier "was never based on the average of AT&T employees in Pension Band 335," but "has grown at the same rate as negotiated increases for other bargained employees."

In 1997, the Plaintiffs filed suit against the various defendants in this case: SBC, as Plan Administrator; the former employer, SWBYP; the Plan itself, SBS Pension Benefit Plan; and the former administrator, AT&T Corp. Plaintiffs asserted various claims, on behalf of themselves and a putative class, for violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B)[4],(a)(2), and (a)(3). The gist of Plaintiffs' claims was that the plan administrator had wrongfully interpreted the plain language of the Plan with respect to the calculation of the denominator portion of the special multiplier. Plaintiffs alleged that the incorrect interpretation reduced their monthly pension benefits.

On August 4, 1999, the district court dismissed Plaintiffs' claims against AT&T on statute of limitations grounds.[5] On August 9, 1999, the District Court granted summary judgment dismissing all of Plaintiffs Tutt and Simms' claims because they had not exhausted their administrative remedies. On the same day, the district court

---

[4] 29 U.S.C. § 1132 (a)(1)(B) provides in relevant part: A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

[5] Plaintiffs' original brief contends that the district court erred in dismissing its claims against AT&T. However, on February 7, 2001, Plaintiffs filed a motion seeking to dismiss AT&T from the appeal. We subsequently dismissed Plaintiffs' appeal with respect to AT&T. Accordingly, the briefed issues which dealt with AT&T are no longer before the Court and will not be addressed in this opinion.

denied Plaintiffs' motion for class certification, reasoning that the class lacked numerosity because of Plaintiffs' failure to show that each purported class member had exhausted his/her administrative remedies. Subsequently, the district court granted summary judgment to the remaining Defendants on all of Gosselink's claims. The district court held that Gosselink's ERISA claims for declaratory and injunctive relief could not be maintained under *Varity Corp. v. Howe*, 516 U.S. 489 (1996) because the claim for pension benefits under section 1132(a)(1)(B) afforded him an adequate avenue for legal redress. It then dismissed Gosselink's section 1132(a)(1)(B) claim for increased pension benefits, holding that, as a matter of law, the Plan administrator's interpretation of the relevant plan language was legally correct and not an abuse of discretion.

## II. STANDARD OF REVIEW

The district court's decision to grant summary judgment on Gosselink's claim for recovery of pension benefits is the central issue on appeal. We review the district court's grant of summary judgment on this claim *de novo,* applying the well-known standards specified in Rule 56(c) which were applied by the district court. *McClendon v. City of Columbia,* 258 F.3d 432, 435 (5th Cir. 2001).

When an ERISA benefits plan provides the plan administrator with discretionary authority to construe the terms of the Plan, the plan administrator's denial of benefits is reviewed for abuse of

6

discretion.  *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201 (5th Cir. 1997)(citing *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  Here, the Plan vests the administrator with this authority.  Therefore, we review *de novo* the district court's holding on whether the plan administrator abused its discretion. *Threadgill v. Prudential Securities Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998); *Tolson v. Avondale Industries, Inc.*, 141 F.3d 604, 608 (5th Cir. 1998).

## III. DISCUSSION

## A.    Applicability of the *Wildbur* Two-Step

It should go without saying that eligibility for benefits "under any ERISA plan is governed in the first instance by the plain meaning of the plan language." *Threadgill*, 145 F.3d at 292. However, in this Circuit, we have often applied a two-part test when reviewing a plan administrator's denial of benefits: First, a court must determine the legally correct interpretation of the plan.  If the administrator did not give the plan the legally correct interpretation, the court must then determine whether the administrator's decision was an abuse of discretion. In answering the first question, i.e., whether the administrator's interpretation of the plan was legally correct, a court must consider: (1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs

7

resulting from different interpretations of the plan. *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 637-638 (citations omitted).

If a court concludes that the administrator's interpretation is legally incorrect, the court must then determine whether the administrator abused his discretion. Three factors are important in this analysis: (1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith. *Id.* "Only if the court determines that the administrator did not give the plan the legally incorrect interpretation, must the court then determine whether the administrator's decision was an abuse of discretion." *Tolson,* 141 F.3d at 608.

Plaintiffs contend that the Defendants' interpretation of the Plan violates the plain meaning of the language governing the calculation of pension benefits for DSRs. As such, Plaintiffs argue that the court should not employ the two-step test as set forth in *Wildbur*. Plaintiffs suggest that rigid adherence to the *Wildbur* approach could produce the anomalous finding that a Plan administrator's interpretation which directly violates the plain meaning of the plan language is not an abuse of discretion simply because the plan language has always been interpreted in the same manner and there are no inferences of bad faith.

8

We agree with the Plaintiffs that the second step in the *Wildbur* two-step approach is not instructive to our analysis of the instant case. *See Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307-08 & n.3 (5th Cir. 1994) (recognizing that "the reviewing court is not rigidly confined to [*Wildbur's*] two-step analysis in every case"); *accord Threadgill*, 145 F.3d at 292, n.12. Clearly, if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations. However, in the instant case, the flaws in the second step of the *Wildbur* approach need not concern us because the administrator's interpretation of the plan is "legally correct."

**B. Plan Interpretation**

Neither party disputes the fact that the administrator has given the plan a uniform construction. The terms of the Plan formula for determining DSR benefits have been consistently interpreted since the plan's inception in 1980. Therefore, the first prong of the "legally correct" test weighs in favor of the Defendants.

Similarly, the third prong of the "legally correct" test weighs in favor of the Defendants. The drafter of the Plan devised the fractional multiplier to provide equity to AT&T employees

9

across all pension bands.  In other words, pension benefits as a percentage of pre-retirement compensation should be relatively equivalent between a DSR and any other employee, given a common number of years of service.[6]  In practice, proportionality has been maintained because most categories of employees, including DSRs, receive pension benefits of approximately 35-38% of their pre-retirement compensation. Since Plaintiffs' interpretation of the plan language would increase the DSR replacement percentage above the target replacement percentage range, it is apparent that there would be unanticipated costs resulting from Plaintiffs' interpretation.

The most important factor to consider, whether the administrator's interpretation is consistent with a fair reading of the plan, also cuts in favor of the Defendants.  As mentioned previously, the question in this case is how to calculate the denominator of the special multiplier in the DSR pension formula. We look to the relevant plan language for the answer.

> [T]he denominator of such fraction shall equal the average of the median maximum annual basic rate of pay related to Pension Band number 135, as of the applicable August 1 date, and the medians of the respective maximum basic rates of pay related to Pension Band number 135, as of August 1 of each of the preceding two years.  The median maximum annual basic rate of pay related to Pension Band number 135

---

[6] The relationship between pre-retirement compensation (wages) and pension amounts is commonly referred to as a replacement ratio.

shall be $23,954 as of August 1, 1978, $25,996 as of August 1, 1979 and $28,720 as of August 1, 1980. The median maximum annual basic rate of pay as of August 1 of any subsequent applicable year shall be determined by multiplying the median maximum annual basic rate of pay as of August 1 of the immediately preceding year by the sum of one plus the rate of increase, from such previous August 1 date, in the general maximum annual basic rate of pay for the job rate at the midpoint of Pension Band number 135.

This language explains how to calculate the denominator number for 1980. The "median maximum annual basic rate of pay related to Pension Band 135" dollar amounts for 1980 ($28,720), 1979 ($25,996), and 1978 ($23,954) are specified in the Plan. The three year average of these numbers is $26,223. The Defendants utilized the $26,233 figure as the denominator of the special multiplier in 1980. Plaintiffs now concede that the denominator number in 1980 was correctly determined by the Plan Committee.[7]

Plaintiffs, however, take exception to the administrator's determination that the "job rate" at the midpoint of the Pension Band 135 wage range scale stated in the Plan was to be increased each year by the generally bargained for wage increase for all non-

---

[7] Interestingly, Plaintiffs contended at the district court level that the original 1980 "median maximum annual basic rate of pay related to Pension Band 135" is $8,970 (the lower base salary excluding commissions paid to DSRs in 1980). This interpretation results in Plaintiff Gosselink's monthly pension benefits exceeding 100% of his pre-retirement salary. Clearly, Plaintiffs' district court argument presents a result that is incongruous with the plain language of the plan and absurdly disproportional to the monthly pension benefits of the other non-DSR employees.

11

commissioned employees determined during collective bargaining between SWB Yellow Pages and the Communication Workers of America ("CWA"). Plaintiffs argue that the "median maximum annual basic rate of pay related to Pension Band 135" may be determined for each year after 1980 only by taking into account the sporadic times when the basic fixed wage for the DSR job itself received a collectively bargained increase. For example, under Plaintiffs' interpretation, the "median maximum annual basic rate of pay" for 1981 would be calculated by using the undisputed 1980 "median maximum annual basic rate of pay" figure of $28,720 as a starting point for the fixed average calculation.  However, the "rate of increase in the general maximum basic rate of pay for the job rate at the midpoint of Pension Band 135" would be calculated by determining the percentage increase, if any, in the base weekly salary received by DSRs between 1980 and 1981.   The same "rate of increase" calculation would be done for the successive years after 1981. Plaintiffs claim that this type of "rate of increase" calculation increases their pension benefits.   Specifically, Plaintiff Gosselink calculates that his monthly pension benefit, as of April 1, 1997, would increase from $1,543.60 to $1,944.90.

We find that the administrator's interpretation of the relevant plan language, i.e., "the rate of increase . . . in the general maximum basic rate of pay for the job rate at the midpoint of Pension Band 135," is consistent with a fair reading of the plan

12

for several reasons.[8]  First, the Plaintiffs interpret the relevant plan language as requiring the denominator to be increased by the rate of increase in the base weekly salary of a "job", i.e, the DSR job, assigned to Pension Band 135.   However, the plan language specifically refers to the rate of increase in the "job rate" at the midpoint of Pension Band 135. According to the Defendants, that "job rate" would then be used to relate a DSR's pension to that paid to a fixed wage employee who received the Pension Band 135 amount.   From this viewpoint, therefore, the reference to "job rate" indicates that the escalation of the denominator is not to be linked with any actual pay increases received by any specific employee, or "job" assigned to Pension Band 135.[9]   Indeed, the

---

[8] We note that the relevant language at issue is hardly a model of clarity.   Even so, however, the relevant language does not require the Plan to be interpreted in the manner espoused by the Plaintiffs.

[9] Plaintiffs' argument concerning the use of the term "Annual Basic Rate of Pay" in the 1992 Plan does not dissuade us from accepting this understanding of the term "job rate."  The 1992 Plan does define the term "Annual Basic Rate of Pay" to  mean "the specific, annualized, fixed wage rate assigned . . . to an employee."  Plaintiffs suggest that this definition requires the administrator to construe the escalator provision as referring to an increase in the basic rate of pay for the DSR job.  We do not find this argument to be persuasive for two reasons.  First, the definition is generic and does not link the "specific annualized, fixed wage rate" to a DSR employee or even an employee assigned to pension band 135.   It simply defines the term to mean "the specific, annualized fixed wage rate assigned . . . *to an employee*."  Second, the capitalized term is used in sections of the Plan unrelated to the specific provision at issue in this case. There is simply no indication that the use of the capitalized term "Annual Basic Rate of Pay"  in the 1992 Plan intended to change the original understanding of the uncapitalized term "annual basic rate

13

Plan's draftsman testified that the so-called "job rate" did not refer to "individuals [or] a particular job."

Second, as a practical matter, it seems unlikely that the DSRs' base weekly salary was to be the benchmark for the calculation of subsequent rates of increase in all years after 1980 when it is agreed to by both parties that the calculation of the denominator in 1980 did not even remotely involve the DSRs' actual base weekly salary.  On the other hand, because the 1980 "median maximum annual basic rate of pay" figure was in the wage range related to the Pension Band 135 pension amount as provided in the Plan's "Pension Band Conversion Table," it makes some sense to interpret the escalator provision in a way that adjusts the "job rate" at the midpoint of the Pension Band 135 wage range in accordance with the generally bargained rate of wage increase determined through the collective bargaining agreement.  This is especially true because the midpoints of every other Pension Band wage range were similarly adjusted to reflect increases in the generally bargained for rate of wage increases.[10]

_____

of pay" as specified in the 1980 Plan.

[10] The plausibility of the administrator's interpretation is further underscored by the fact that fixed wage employees were assigned to Pension Band 135 from 1980-1983, but none have been assigned since 1984.  If, after 1983, there would have been fixed wage employees in a job assigned to Pension Band 135 who received increases in their annual basic rate of pay(through wage increases bargained for in the collective bargaining process), the midpoint of the job rate in Pension Band 135 would clearly have had to

14

Finally, we note that the administrator's interpretation of the disputed plan language furthers the overall plan goal of maintaining proportionality of pension benefits as a percentage of wages across pension bands.  Thus, we find that the administrator's approach is consistent with a fair reading of the plan.

## IV.  CONCLUSION

In sum, our analysis of the three factors outlined in the first step of *Wildbur* leads us to conclude that the administrator's interpretation is legally correct. By implication, we also find that the administrator's interpretation does not violate the plain meaning of the plan language as the language itself is susceptible to various interpretations.[11]   Therefore, the district's court summary judgment rulings on Plaintiff Gosselink's claims for increased pension benefits and declaratory/injunctive relief are AFFIRMED.

Because we AFFIRM the district court's rulings on the section 1132(a)(1)(B) claims for denial of pension benefits and declaratory/injunctive relief, we need not review either the failure to exhaust administrative remedies issue or the district court's denial of Plaintiffs' motion for class certification.

---

increase in accordance with those wage increases. But not for this peculiarity, Plaintiffs' interpretation would be facially unsupportable.

[11]   The Plaintiffs themselves relied upon three alternative formulations for calculating the amount of pension benefits they claimed entitlement to under the terms of the Plan.

AFFIRMED.