William J. HAMLIN

v.

**BLUE CROSS AND BLUE SHIELD OF LOUISIANA, et al.**

No. 01–225.

United States District Court, E.D. Louisiana.

Dec. 21, 2001.

674

Alvin Joseph Bordelon, Jr., Bordelon, Hamlin & Theriot, New Orleans, LA, for plaintiff.

Charles Andrew O'Brien, III, Chalres Andrew O'Brien, Baton Rouge, LA, for defendant.

## ORDER AND REASONS

FELDMAN, District Judge.

Before the Court are cross-motions for summary judgment. For the reasons that follow, both motions are DENIED.

### Background

William Hamlin and his dependents were covered by his law firm's Medical Benefit Plan which purchased health insurance from Louisiana Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana. The Plan does not pay for health care expenses that are deemed to be not medically necessary. Blue Cross has full

discretionary authority in deciding eligibility for benefits, determinations of fact, and construing the terms of the Plan. Blue Cross is both the insurer and the administrator of the Plan.

Hamlin's daughter Regan suffers from mental illness.[1] In the summer of 1999, Regan was confined for residential treatment at the Meridell Achievement Center in Texas, and Blue Cross paid for her treatment. Regan was thereafter treated as an outpatient by Dr. Betty Muller of the DePaul Tulane Hospital. In February, 2000, Regan relapsed into depression, threw away her medication and ran off to Mississippi, where she was later arrested for car theft. After two weeks in jail, Regan was released to her parents on the condition that she seek treatment in New Orleans.

Regan was admitted to the DePaul Tulane Hospital Psychiatric Unit on March 2 and confined there for almost three weeks. Regan's situation was first evaluated by a psychiatric social worker, Ann Wilder, who recommended hospitalization based on the information Mr. Hamlin gave her. Wilder reported to the director of DePaul's adolescent psychiatric unit, Dr. Paul Pelts, who admitted Regan. Dr. David Tucker, a psychiatric resident, then examined Regan and described her admission diagnosis as "Trichotillomania, attention deficit hyperactivity disorder and major depressive episode, recurrent." Among Dr. Tucker's findings was that Regan merited a global assessment function score of 40. The next day, Dr. Pelts examined Regan and assigned her a GAF score of 25, which indicates that Dr. Pelts believed Regan to have more severe impairment than Dr. Tucker's evaluation reflected.

On March 6, DePaul Tulane faxed Regan's chart to Greg Quartano, the Utilization Review Clinical Coordinator for Health Associates of America. Blue Cross contracts with HAA for review of mental health claims. HAA evaluates claims according to a series of internal criteria that it does not share with treating physicians. Hamlin accuses that HAA and Blue Cross have conflicts of interest in evaluating claims because of their economic incentives to deny claims.[2]

After reviewing Regan's records, Quartano completed a "Level of Care Justification" form in which he wrote that Regan's inpatient treatment was not medically necessary because she was not "suicidal, homicidal, a danger to self or others, did not display any thought disorders, or any mood that was incongruent with circumstances." Quartano recommended that Regan be referred to outpatient family therapy instead of in-patient treatment as had been recommended. In making this assessment, Quartano relied on the Tucker evaluation of Regan and disregarded the findings of Dr. Pelts. Quartano consulted by telephone with another psychiatrist, Dr. Henry Olivier, who also agreed. Hamlin contends that Quartano, contrary to HAA policy of reviewing a patient's entire medical chart, failed to take into account the diagnosis of Dr. Pelts and Ms. Wilder's report, and adds that Dr. Olivier did not have Regan's records before him in reviewing the claim.[3] Quartano then sent

---

1. During all periods at issue in this case, Regan was a minor and covered under the Plan.

2. HAA reports quarterly to Blue Cross regarding its gross and net savings to Blue Cross, at least some of which arise from the disallowance of benefits for services that HAA deems to be medically unnecessary. It is rare for Blue Cross to reverse an HAA decision rejecting hospital admission.

3. HAA bases its determination of medical necessity largely on the documentation of the "admitting" psychiatrist. But it is unclear

Hamlin a denial of benefits letter, stating that the documentation did not indicate that Regan's DePaul treatment was medically necessary; Hamlin was invited to submit additional documentation that might suggest otherwise.

Hamlin replied to Quartano, and requested that he speak with Dr. Pelts. On March 13 Quartano agreed to set up an "MD to MD review" between doctors Pelts and Olivier to discuss the medical necessity of Regan's treatment. By the next day, Pelts had concluded that Regan no longer needed hospitalization but did need residential treatment because he believed she was a flight risk and a danger to herself.[4] That same day, March 14, DePaul faxed to Quartano Regan's medical records and an opinion letter from Dr. Pelts that described his conclusions. Quartano sent the Pelts letter to Olivier, who completed another form rejecting the DePaul admission and also stating that he would not even recommend residential treatment because it had been tried before and failed.

On March 15, Pelts and Olivier discussed by telephone Regan's treatment.[5] The details of this conversation are, not surprisingly, disputed. It seems clear that Quartano was present with Olivier during the conversation and that Dr. Pelts be-

came frustrated with Dr. Olivier. Hamlin charges that HAA conducted this MD to MD review in bad faith.

After the MD to MD review, Quartano contacted Dr. J. Roniger to conduct still another review of Regan's treatment needs. It turns out that Dr. Roniger agreed with Dr. Olivier's conclusions. (There is some dispute as to what documents Roniger had before him in conducting his review). Quartano wrote another letter to Hamlin stating that after the MD to MD review, HAA would stick by its original decision to deny benefits for the DePaul admission.

Quartano completed an "Initial Review Form" dated March 17, evaluating Regan's suitability for inpatient care. In the form, he stated that Regan's most recent treatment was her 1999 residential treatment and that there was no medical treatment plan. These statements overlooked Regan's outpatient treatment by Muller and the "immediate treatment plan" described by Tucker in his report. Quartano again relied on the Tucker evaluation. Quartano also sent Hamlin a letter dated March 21 stating that on March 17 HAA determined that the documentation did not confirm the medical necessity of Regan's residential level of care.[6]

whether Pelts or Tucker should be considered the admitting doctor for purposes of the medical necessity determination. Quartano's "Initial Review Form" lists Dr. Pelts as Regan's physician.

4. Blue Cross contends that Dr. Pelts' recommendations arose more from a desire to accommodate Hamlin's wishes and to avoid returning Regan to jail than from Regan's actual medical needs. Indeed, Regan was confined at DePaul for seven days after Pelts had determined that she no longer needed hospitalization. But whether the suspicions of Blue Cross are otherwise supportable is uncertain. Wilder noted in her report that Hamlin expected that Regan would be trans-

ferred to Meridell. Regan's Meridell treatment included only about six hours a week of therapy. She spent much more time studying to obtain her GED. Thus, it seems everyone questions each other's motives for their decisions in this case.

5. It is unclear at what point Olivier had before him Regan's entire medical records from DePaul.

6. HAA's criteria for determining the medical necessity of inpatient care are different from its criteria for residential care. On several occasions, doctors who reviewed Regan's records appear to have applied the wrong criteria.

Regan remained at DePaul until she was released on March 21. At that point Dr. David Riedel examined Regan at Meridell and admitted her to that facility, concurring that residential treatment was necessary and assigning her a GAF score of 45. Hamlin sent HAA an opinion letter by Muller dated March 22 which supported Regan's treatment at Meridell.[7] Then on April 4 Olivier wrote stating that Regan needed intensive outpatient therapeutic intervention.[8] Regan was discharged from Meridell on July 29.

After Regan left Meridell, Quartano obtained her medical records from that facility and sent them to Dr. Charles Chester for still another look at medical necessity. Dr. Chester wrote on August 15 stating that Regan did not meet HAA's criteria for inpatient treatment. On August 22, Quartano wrote Hamlin saying that even Regan's Meridell treatment was not medically necessary. And on September 11, Olivier wrote yet another letter in which he stated that, based on Riedel's examination of Regan, she did not meet the criteria for admission to an "acute treatment facility." Dr. Olivier also concluded that Regan's Meridell treatment was not medically necessary.

After HAA's various reviews and denials of benefits, Hamlin appealed to Blue Cross. On September 14, Blue Cross's Medical Appeals Committee met and decided to seek the opinion of a child/adolescent psychiatrist in Regan's case.[9] Quartano then contacted a child psychiatrist, Dr. Joseph Grizzaffi, and spoke with him on the morning of September 21. That same afternoon, the Appeals Committee met again and Quartano informed them that Dr. Grizzaffi had upheld the benefit denials for both DePaul and Meridell. Based on this information, the Committee also upheld the denials.

On September 25, Dr. Grizzaffi wrote to clarify his opinion that Regan's Meridell admission was not medically necessary. Dr. Grizzaffi's letter states that Regan did not meet the criteria for residential admission because (1) the "admit clinical data" did not support her "[i]npatient admission," (2) because prior residential treatment had failed, Meridell could not document a reasonable expectation that such treatment would improve Regan's condition, and (3) it was questionable whether Regan would willingly participate in treatment. On September 28, Dr. Grizzaffi also wrote a letter explaining that Regan's admission to DePaul was likewise not medically necessary. He wrote that his opinion was based on the "psychiatric evaluation done at the time of admission." He also noted that there were some "indications in the history [that Regan] was admitted to the hospital more because it was court ordered and an alternative to further incarceration." It is unclear what records Dr. Grizzaffi reviewed. Grizzaffi, who no longer works with HAA, states that his reviews were restricted to the documentation of Regan's condition at the time of each admission. Having exhausted the appeals process, Hamlin sued Blue Cross over its denial of benefits for the two admissions. Blue Cross has a contract with DePaul containing a "hold harmless" clause, which states that the hospital may not require Hamlin to pay for services

---

7. It is unclear whether HAA placed Muller's letter with Regan's records to be included in later physician reviews. Hamlin contends that Quartano discarded the letter.

8. What seems clear from this otherwise conflicted record is that Mr. Hamlin's daughter needed some sort of intervention in spite of the disagreements among the psychiatrists.

9. All the previous doctors reviewing Regan's records were psychiatrists but were not certified in child/adolescent psychiatry.

Blue Cross deems not medically necessary. It is unclear whether DePaul charged Hamlin for its treatment of Regan.

## I. *Standard for Summary Judgment*

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *See id.* Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249–50, 106 S.Ct. 2505. Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 649 (5th Cir.1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. *Id.* Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. *Martin v. John W. Stone Oil Distrib., Inc.,* 819 F.2d 547, 549 (5th Cir.1987). Finally, in evaluating the summary judg-

ment motion, the court must read the facts in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## II. *Application*

▮ This Court generally reviews *de novo* a denial of benefits challenged under § 502(a)(1)(B) of ERISA unless the benefits plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *See Firestone & Tire Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where, as here, the plan gives the administrator discretion to determine eligibility or to construe its terms, the Court reviews the administrator's decision denying benefits for abuse of discretion. *Id.* An administrator abuses its discretion in denying a claim when there is no rational basis in the administrative record for the denial. *See Vega v. National Life Ins. Services, Inc.,* 188 F.3d 287, 289 (5th Cir.1999) (en banc).

▮ In determining whether an administrator abused its discretion in denying a claim, the Court considers whether the administrator is self-interested in the decision. *Vega,* 188 F.3d at 295. Such a conflict of interest exists when the administrator "both insures and administers the plan," because "the administrator potentially benefits from every denied claim." *Id.* The Fifth Circuit held in *Vega* that the denial of a claim by a self-interested administrator should be reviewed under a "sliding scale" standard for abuse of discretion. *Id.* at 298. The greater the administrator's conflict, the less deferential the abuse of discretion standard will be. *See id.* at 299. It seems proof of bad faith would trump a claim of rational basis.

▮ *Vega* involved wholly-owned subsidiary of the insurer as the plan administrator. Because such an arrangement creat-

ed a lesser conflict than if the insurer and administrator were to operate within the same entity, the Court reviewed the administrator's decision with "only a modicum less deference" than it would a non-self-interested decision. *Id.* at 301. Blue Cross is both the insurer and the plan administrator in this case, but it uses HAA to review its claims. *Vega* noted that "a purely contractual relationship between the insurer and the administrator does not create an inference that the administrator is conflicted." *Id.* at 301 n. 11. The *Vega* court recognized that determining the nature and extent of an administrator's conflict of interest is difficult and implicates many factors.[10]

The extent to which Blue Cross and HAA were conflicted is unclear and is a factual issue that the Court must consider in determining how much deference, if any, to give Blue Cross's decision to deny benefits. Unlike the plaintiffs in *Vega,* who presented no evidence of the degree of conflict of interest, Hamlin has presented sufficient evidence of a conflict to preclude summary judgment. *See Vega,* 188 F.3d at 301. The nature of the relationship between Blue Cross and HAA and whether it led to significant incentives for HAA to deny meritorious claims is a disputed issue of fact.

Hamlin has also presented sufficient evidence to create an issue of fact as to whether HAA and Blue Cross acted in bad faith in denying benefits for Regan's treatment. The parties dispute what records

HAA gave the various reviewing doctors and whether they applied the right criteria for determining medical necessity. The evidence indicates some confusion between the application of residential and inpatient criteria. Hamlin has presented probative evidence that HAA may have restricted its reviewing doctors' attention to certain portions of Regan's medical records to the exclusion of others, which is certainly contrary to its stated internal procedures. If HAA manipulated the record and the reviewing process in such a way as to constitute bad faith, then the decision to deny benefits would deserve no deference at all. *See Rhorer v. Raytheon Engineers and Constructors, Inc.,* 181 F.3d 634 (5th Cir. 1999) (denying summary judgment where "slight" evidence of bad faith by administrator created fact issues underlying the determination of whether the administrator abused its discretion); *see also James v. Louisiana Laborers Health and Welfare Fund,* 29 F.3d 1029, 1033–34 (5th Cir. 1994); *Meditrust Financial Services Corp. v. The Sterling Chemicals, Inc.,* 168 F.3d 211 (5th Cir.1999); *Gosselink v. AT & T, Inc.,* 272 F.3d 722 (5th Cir.2001) (assuming that bad faith implies abuse of discretion).

It is only after the Court determines how much deference to give Blue Cross's decisions denying benefits that it can review the administrative record as it existed prior to Hamlin's filing suit. *See Vega,* 188 F.3d at 300. The Court must resolve the factual issues underlying Blue Cross's reasonably possible conflict of interest as both administrator and insurer determinations

---

10. "[A]n insurance company may well encounter drawbacks from unreasonably denying meritorious claims. The company's reputation may suffer as a result and others may be less willing to enter into contracts where the company has discretion to decide claims. The argument is that [the company] … has acted opportunistically by engaging in activity that is acceptable under the terms of the agreement (exercising its discretion to deny claims) but contrary to the purpose of the agreement. The issue of whether a party is apt to engage in opportunism is one that preoccupies contract law and for which there are no easy answers. We do not believe that the reputational and contractual costs incurred by [the company] denying a claim should be ignored." *Vega,* 188 F.3d at 295 n. 8 (internal citation omitted).

before determining where on the *Vega* sliding scale this case falls. Therefore, genuine issues of material fact persist and this case is inappropriate for summary judgment.

Accordingly, Blue Cross's motion for summary judgment is DENIED and Hamlin's motion for partial summary judgment is also DENIED.