# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-20724
Cons. w/ No. 17-20217

United States Court of Appeals
Fif h Circuit

**FILED**
June 1, 2017

Lyle W. Cayce
Clerk

WILLIAM LANGLEY,

      Plaintiff - Appellant

v.

HOWARD HUGHES MANAGEMENT COMPANY, L.L.C., SEPARATION
BENEFITS PLAN, Director of Human Resources, Howard Hughes
Management Company, L.L.C., as Plan Administrator,

      Defendant - Appellee

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:13-CV-3595

Before KING, JOLLY, and PRADO, Circuit Judges.

PER CURIAM:*

      Plaintiff–Appellant William Langley sued Defendant–Appellee Howard Hughes Management Company, L.L.C. Separation Benefits Plan alleging, in pertinent part, a claim for severance benefits under the Plan pursuant to the provisions of the Employee Retirement Income Security Act.  After the parties

---

      * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-20724

filed cross-motions for summary judgment, the district court ordered Langley take nothing from the Plan and that Langley pay the Plan's attorneys' fees. Langley now appeals. We REVERSE and RENDER for Langley.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

In 2002, the Woodlands Operating Company, L.P. (TWOC) hired William Langley on an at-will basis to manage two golf clubs, the Woodlands Country Club and the Club at Carlton Woods.

In 2006, Langley was promoted to vice president of club operations. In connection with that promotion, TWOC provided Langley with an unsigned memorandum captioned "DRAFT" to document the parties' "recent discussions relating to [Langley's] compensation." The memorandum stated, in pertinent part, that Langley would receive (1) an annual "Cash Flow Participation Award" of 4% of the approved award pool, and (2) a "Club Sale Incentive Award" of between 0.5% and 1% of the sales price if the Woodlands Country Club or the Club at Carlton Woods was sold, depending on the sales price of the relevant club. The Cash Flow Participation Award was granted pursuant to TWOC's Senior Management Incentive Plan.[1] It is unclear whether the Club Sale Incentive Award was made pursuant to an existing benefit plan; the "DRAFT" memorandum simply describes the award as a "bonus."

In June 2007, the Woodlands Country Club was sold and Langley was paid 1% of the club's sales price in accordance with the Club Sale Incentive Award. The earning statement provided to Langley described the payment as a "commission."

---

[1] The Senior Management Incentive Plan provided that, after certain financial targets were met, a percentage of cash distributions made by TWOC to its partners would be available for cash flow participation awards to eligible participants. TWOC's executive committee was granted sole discretion in determining how the cash flow participation pool was allocated among participants.

No. 16-20724

In 2011, the Howard Hughes Corporation (Howard Hughes) purchased the outstanding equity interests in TWOC, and TWOC became a wholly owned subsidiary of Howard Hughes. At year's end, Howard Hughes terminated the Senior Management Incentive Plan.[2] Howard Hughes also adopted a new compensation structure, which included the Howard Hughes Management Company, L.L.C. Separation Benefits Plan (the Plan) at issue in this case.

The Plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act (ERISA). It provides that if an "Employee" is involuntarily terminated, he or she is entitled to receive 12 "Weeks of Pay," plus 4 "Weeks of Pay" for each continuous year of full-time service.[3] The Plan's definition of "Employee" is of critical importance to this appeal:

> Employee means a person who is employed by [Howard Hughes], including a person on an approved leave of absence. The term Employee shall not include:
>
> (a) Any person whom the [Plan] Administrator determines is compensated by special fees or employed pursuant to a special contract or arrangement;
>
> (b) Any person engaged in a capacity which the Administrator determines to be contract labor or an independent contractor; or
>
> (c) Any person whom the Administrator determines is a temporary employee.

At least two other provisions of the Plan are also relevant to this appeal. The first provides that "separation pay" under "any other contract or arrangement" will reduce the separation benefits available under the Plan. The second

---

[2] As discussed *supra*, it is not entirely clear from the record whether Howard Hughes also terminated the Club Sale Incentive Award (or ever recognized it in the first instance).

[3] The Plan defines "Week of Pay" as "the Employee's gross annual base salary, excluding overtime, bonuses and commissions, divided by 52."

3

provides that the Administrator of the Plan has "full discretionary authority to interpret the Plan."

In May 2012, the Plan's Administrator emailed Langley the Summary Plan Description (SPD) for the Plan. The email indicated that the Plan replaced TWOC's Severance Pay Plan and that the SPD was being distributed to Langley because ERISA required it to be "distributed to all employees." In pertinent part, the SPD states that "[y]ou are eligible to participate in the Plan if you are on the Company's active payroll," unless "you are determined [by the Administrator] to be contract labor or an independent contractor . . . or in any other employee group or classification not eligible to participate in this Plan."

In June 2013, Langley was involuntarily terminated by TWOC. The following month he submitted a claim for $255,000 in severance benefits under the Plan. The Administrator—who was also the director of Howard Hughes's human resources department—denied Langley's claim, concluding that he was not an "Employee," as defined by the Plan. According to the Administrator, Langley was "compensated by special fees or employed pursuant to a special . . . arrangement" and, thus, ineligible for benefits.[4] The purpose of the Plan's eligibility exclusions for special fees and special arrangements, the Administrator asserted, was "to prevent employees . . . from receiving Plan separation benefits in addition to separation . . . payments under employment agreements or special compensation arrangements." Because Langley's employment likely would have terminated with the sale of both clubs, the Administrator further asserted, the Club Sale Incentive Award was, in effect, a substitute for separation benefits under the Plan. Langley timely appealed the Administrator's determination, which the Administrator also denied.

---

[4] The Administrator conceded that Langley was not employed pursuant to a special contract. Accordingly, we do not separately address that prong of the Plan's "Employee" eligibility exclusion.

4

No. 16-20724

Langley filed the instant suit on December 9, 2013, asserting claims under ERISA, namely a claim for separation benefits under 29 U.S.C. § 1132(a)(1)(B) and, alternatively, a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3)(B).[5]　In February 2014, the Administrator filed her answer, and the parties filed cross-motions for summary judgment.　On August 10, 2014, the district court issued an opinion on summary judgment, indicating the Administrator "will" prevail and Langley "will" take nothing, and "invit[ing]" the Administrator to move for attorneys' fees.　The Administrator subsequently moved for $143,814 in attorneys' fees, which the district court granted in full in an opinion and accompanying order on October 24, 2016. Langley timely appealed.[6]

---

[5] Because we agree with Langley that the Administrator abused her discretion in denying Langley's claim for separation benefits, we need not, and do not, address Langley's alternative claim for breach of fiduciary duty.

[6] Langley technically filed two notices of appeal, which resulted in the two consolidated appeals before us.　On October 31, 2016, before the district court entered its March 6, 2017 final judgment, Langley filed his first notice of appeal.　That appeal was docketed in this court as No. 16-20724.　On March 31, 2017, after the district court entered its March 6, 2017 final judgment, Langley filed another notice of appeal.　That appeal was docketed in this court as No. 17-20217.　On May 4, 2017, we consolidated both of Langley's appeals.　Before consolidation, the Administrator moved for partial dismissal in No. 16-20724, arguing that Langley's appeal was only timely as to attorneys' fees because the district court's opinion on summary judgment was itself a final appealable order.　A prior panel of this court properly denied the Administrator's motion. *See Creaghe v. Albemarle Corp.,* 98 F. App'x. 972, 973–74 (5th Cir. 2004) (per curiam) (holding that ruling on motion for summary judgment that indicated action "will" be dismissed was a not a final order that would start the clock for appealing); *see also United States v. F. & M. Schaefer Brewing Co.,* 356 U.S. 227, 232 (1958) (recognizing an opinion only embodies a final decision when the district court "clearly declare[s]" that intention in the opinion); *Blanchard v. Commonwealth Oil Co.,* 294 F.2d 834, 836–37 (5th Cir. 1961) (holding that opinion issued in anticipation of order was not final decision because court did not consider it to be final act in the case).　Although Langley's notice of appeal in No. 16-20724 may have been premature because it was filed before the district court entered its final judgment on March 6, 2017, the notice, in any event, perfected Langley's appeal as of the date judgment was actually entered.　*See* Fed. R. App. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.").

## II.    THE ADMINISTRATOR ABUSED HER DISCRETION

This court reviews summary judgment in ERISA cases de novo, applying the same standards as the district court. *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392 (5th Cir. 2006). However, when a district court hears a complaint about the denial of benefits, it is not sitting as a court of first impression, but rather in an appellate role. *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 456 (5th Cir. 2014). And when, as in this case, the language of a benefit plan grants discretion to an administrator to interpret the plan and determine eligibility for benefits, the district court's appellate role is narrowly restricted to affirming the administrator's decision unless the administrator has abused its discretion. *Id.* at 457–58.

Typically, the review of an administrator's interpretation of a benefit plan for abuse of discretion is a two-step process.[7] *See Gosselink v. AT&T, Inc.*, 272 F.3d 722, 726–27 (5th Cir. 2001). The first step inquires into whether the administrator's decision was legally correct. *Id.* at 726. If the administrator's interpretation of the plan is legally correct, the inquiry ends because no abuse of discretion could have occurred. *Id.* If the administrator's interpretation of the plan is legally incorrect, a court must then inquire into whether the decision was an abuse of discretion. *Id.* We address each step in turn.

### A.  Legal Correctness

We have previously identified several factors to consider in deciding whether an administrator's interpretation of a benefit plan was legally correct: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and

---

[7] Notably, this two-step analysis is not applicable in every case. For instance, "if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations." *Gosselink*, 272 F.3d at 727.

(3) any unanticipated costs resulting from different interpretations of the plan." *Gosselink*, 272 F.3d at 726. Here, the parties have not identified any costs, besides the benefits at stake in this litigation, associated with the Administrator's (or Langley's) interpretation of the Plan or any cases other than Langley's in which the Administrator has construed the Plan provisions at issue. Accordingly, in deciding whether the Administrator's interpretation of the Plan is legally correct, we focus on the critical second factor—whether the Administrator's interpretation is consistent with a fair reading of the Plan. *See id.* at 727 (describing the second factor as "the most important" one to consider).

The Plan provides that a person is ineligible for benefits if he or she "is *compensated by* special fees or *employed pursuant to* a special . . . arrangement." (Emphases added.) The Plan thus distinguishes between compensation arrangements and employment arrangements. The Administrator largely ignores this distinction, arguing that "the Plan excluded employees with special 'arrangements,'" and that the Club Sale Incentive Award was one such arrangement. The Plan, however, does not exclude employees "with" special arrangements; it excludes those "employed pursuant to" such arrangements. Here, Langley was not employed pursuant to a special arrangement; he was an ordinary at-will employee. Accordingly, the "employed pursuant to a special . . . arrangement" prong of the Plan's "Employee" eligibility exclusion plainly does not encompass the Club Sale Incentive Award or, consequently, bar Langley from receiving severance benefits.

The same is true for the "compensated by special fees" prong of the Plan's "Employee" eligibility exclusion. Any compensation Langley may have been receiving from the Club Sale Incentive Award at the time of his termination cannot fairly be considered "special fees." The Administrator combines several

definitions for "special" and "fee" that she finds favorable to argue that the phrase "special fees" can fairly be read to mean any payment for labor or service (the "fees" component) that has a particular purpose or is extraordinary in nature (the "special" component).    Although dictionary definitions are helpful in reading an ERISA plan, *see, e.g.*, *Branson v. Greyhound Lines Inc.*, *Amalgamated Council Ret. & Disability Plan*, 126 F.3d 747, 758 (5th Cir. 1997), a fair reading of the phrase "special fees" in this case requires more than defining its two constituent terms in isolation, as the Administrator does. Rather, it requires that the phrase be defined in context.  *See, e.g., Ellis v. Liberty Life Assurance Co. of Bos.,* 394 F.3d 262, 271 (5th Cir. 2004) (considering "the context . . . as a whole" when determining plain meaning of an ERISA plan's term).

In context, it is clear that the Administrator's reading of "special fees" is not a fair one.  Under the Administrator's reading, a broad range of employee benefits, including bonuses and commissions (the two ways in which TWOC described the Club Sale Incentive Award), would constitute "special fees" and, thus, result in an employee's exclusion from the Plan.  The Plan, however, provides that "bonuses" and "commissions" are not to be used in calculating "Weeks of Pay," making plain that an employee's receipt of, much less eligibility for, bonuses and commissions does *not* furnish a basis for excluding him or her from the Plan.

The Administrator, implicitly recognizing this conflict with the Plan's plain terms, argues that the Club Sale Incentive Award was "different in kind" from ordinary bonuses and commissions and, therefore, "deserved different treatment" under the Plan.   According to the Administrator, Langley's employment likely would have terminated if both golf clubs were sold, creating

a potential duplication of separation benefits.[8]  But again, the Administrator's position contradicts the Plan's plain terms.  The Plan plainly provides that "[a]n Employee's Separation Benefit [under the Plan] will be *reduced* by the total of all payments paid or payable to the Employee pursuant to any other contract or arrangement providing for separation pay." (Emphasis added.)  It does not provide that an employee may be excluded on the basis of a potential duplication of separation of benefits; as worded, there simply can never be a duplication of separation benefits under the Plan.

The "compensated by special fees" prong of the Plan's "Employee" eligibility exclusion, when read in context, can only be given one reasonable meaning: that an employee will be excluded if, at the time of termination, he or she was being paid a preset amount for a single task regardless of the time required for its completion (rather than being paid a salary).  *See* 29 C.F.R. §§ 541.300(a), 541.605(a) (2016) (defining when a professional employee will be considered to be compensated on a fee, rather than salary, basis for purposes of the Fair Labor Standards Act and, thus, potentially excluded from the Act's overtime requirement); *see also Wegner v. Standard Ins. Co.*, 129 F.3d 814, 819 (5th Cir. 1997) (holding that "overtime" in an ERISA plan could only reasonably be read in a manner consistent with the Fair Labor Standards Act).  Because the amount of the Club Sale Incentive Award was neither preset nor related to the accomplishment of any particular task by Langley, any compensation Langley may have been receiving from the award at the time of his termination cannot fairly be considered "special fees."  Accordingly, the

---

[8] Incidentally, the Administrator has not pointed to any evidence in the record demonstrating that the Club Sale Incentive Award was intended to provide a separation benefit.  Payment of the Club Sale Incentive Award was not triggered by termination; rather, it was triggered by the sale of either of the clubs.

Administrator's reading of the Plan to exclude Langley on the basis of the Club Sale Incentive Award was not legally correct.

## B. Abuse of Discretion

Because we conclude that the Administrator's reading of the Plan was not legally correct, we now consider whether it was also an abuse of discretion. In deciding whether a plan administrator has abused his or her discretion, we consider whether (as in this case) the administrator was both paying and reviewing claims and, thus, operating under a structural conflict of interest. *See Porter v. Lowe's Cos., Inc.'s Bus. Travel Accident Ins. Plan*, 731 F.3d 360, 364 (5th Cir. 2013). We also consider: "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *Gosselink*, 272 F.3d at 726. But "if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations." *Id.* at 727.

In this case, the Administrator's interpretation of the Plan was an abuse of discretion because it "'directly contradict[ed] the plain meaning of the plan language' under the 'factual background' abuse of discretion prong." *LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 842 (5th Cir. 2013) (alteration in original) (quoting *Gosselink*, 272 F.3d at 726–27). As detailed *supra*, the Plan's "Employee" eligibility exclusion plainly did not bar Langley, an ordinary at-will employee compensated at the time of his termination by salary and bonus, from receiving severance benefits.

Therefore, "we do not need to consider the other . . . abuse of discretion factors."[9]  *Id.*

## III.  CONCLUSION

For the foregoing reasons, we REVERSE the district court and RENDER judgment in favor of Langley in the amount of $255,000, plus attorneys' fees of $18,970.[10]  We DENY Langley's request to invite briefing on the limited issue of appellate attorneys' fees under 29 U.S.C. § 1132(g)(1).

---

[9] Regardless, most, if not all, of the abuse of discretion factors weigh in favor of finding an abuse in this case.  Thus, we would reach the same result if we did consider them.

[10] We note that the Administrator has not (1) disputed the amount of benefits or attorneys' fees requested by Langley; (2) argued that the district court's award of attorneys' fees could stand if we found she abused her discretion in applying the Plan's "Employee" eligibility exclusion; or (3) requested that this case be remanded to her or affirmed on the alternative basis that no "Separation Event" occurred under the Plan (an issue the Administrator declined to decide during the Administrative appeals process).  We further note that Langley has not requested an award of pre-judgment interest.  By failing to raise any of these issues on appeal, the parties have waived them.  *See, e.g.*, *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395 n.4 (5th Cir. 2006).