# United States Court of Appeals
## For the First Circuit

No. 09-2557

MYRIAM GÓMEZ-GONZÁLEZ,
GERARDO ARRIBAS,

Plaintiffs, Appellants,

v.

RURAL OPPORTUNITIES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Boudin, Ripple,* and Selya,
Circuit Judges.

Erick Morales-Pérez for appellants.
Jessica A. Figueroa-Arce with whom Radamés A. Torruella and
McConnell Valdés LLC, were on brief for appellee.

December 2, 2010

---

* Of the Seventh Circuit, sitting by designation.

**RIPPLE, <u>Circuit Judge</u>**.  Myriam Gómez-González, along with her husband, Gerardo Arribas, instituted this action in the United States District Court for the District of Puerto Rico against Ms. Gómez's former employer, Rural Opportunities, Inc. ("ROI"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B); they also sought damages for wrongful discharge and mental distress under Puerto Rico law.  ROI moved for summary judgment on all of the plaintiffs' claims.  The district court granted ROI's motion for summary judgment on all of the federal claims and dismissed the pendent state claims without prejudice.  Ms. Gómez and Mr. Arribas timely appealed.  For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

**A.  Facts**

ROI is a private, not-for-profit regional community development and human services organization.  Its mission is to provide services to farm workers, low-income families and depressed

communities.  ROI's principal office is located in Rochester, New York, and it has an office in Adjuntas, Puerto Rico.

In 1999, ROI was looking for a director of its Puerto Rico operations, and Ms. Gómez was assisting ROI in finding a candidate.  During the process, Lee Beaulac, Senior Vice-President of Housing and Economic Development for ROI, approached Ms. Gómez and asked her to take the position; Ms. Gómez was then forty-nine years old.

At the time Ms. Gómez was hired as director of ROI's Puerto Rico operations, she had a preexisting back problem.  To accommodate her condition, ROI allowed Ms. Gómez, at her discretion, to work from home a few days per week and to work out of the Adjuntas office a few days per week.  When working in Adjuntas, she stayed at a hotel at company expense.

In 2004, Ms. Gómez knew that the housing development program was demanding a great deal of her time and detracting from her ability to focus on other programs.  She requested an additional person to staff the Puerto Rico division and to work as a housing developer.  Ms. Gómez had the task of reviewing applicants and interviewing candidates for the housing development position.  This interview process began in December 2004.  In January 2005, Roger Hernandez applied for the position.  Ms. Gómez interviewed Hernandez and believed that he was qualified for the position.  Ms. Gómez identified four finalists for the position; of

those, she ranked Hernandez highest and recommended that he be offered the position at a higher salary level than that which was initially posted.

Around the time that Hernandez applied for the position at ROI, ROI's executive committee traveled to Puerto Rico to inspect the development sites under Ms. Gómez's authority. Later in January, Stuart Mitchell, Chief Executive Officer of ROI, issued a memo to Ms. Gómez and others that gave notice of a meeting scheduled for early February in Rochester; the purpose of the meeting was to conduct an internal audit of the Puerto Rico projects and programs. In preparation for this meeting, Mitchell asked Ms. Gómez, as well as each member of the staff responsible for administering, supervising and providing technical assistance to Ms. Gómez or to the Puerto Rico programs, to compile a comprehensive list of all the issues that they had encountered with respect to the Puerto Rico operations.

The day before the meeting in Rochester, Mitchell provided Ms. Gómez with a memorandum of issues raised by the Rochester-based staff concerning Ms. Gómez's performance. At the meeting, budget and project issues were discussed, as were issues related to Ms. Gómez's performance. The following areas of concern were articulated: Ms. Gómez and her staff did not communicate

adequately with the Rochester office;[1] Ms. Gómez was making decisions without consulting Rochester program managers; there had been complaints about verbal abuse by Ms. Gómez; Ms. Gómez instilled fear and anxiety in her staff; ROI Puerto Rico operations were not attaining program goals; there were serious difficulties with three real estate development projects in Puerto Rico; and there had been an overall failure of management. Ms. Gómez disagreed with this assessment; however, because she was embarrassed and did not wish to cause a scene, she decided not to contest the items during the meeting.

The following day, Ms. Gómez was given a Notice of Disciplinary Probation, which provided that she was being placed on probation in part because of "[n]ot meeting expectations of the Director for Real Estate Development and other technical supervisors in regard to timely communication, effective problem-solving and establishing meaningful levels of trust and confidence needed to insure that our programs and projects are managed properly." App.261. The Notice also advised that management expected improvement in several areas, including:

> Immediate communication with Jay Golden (telephone preferred, e-mail second choice) or Keith when any issue arises that could pose a

---

[1] More specific complaints included that Ms. Gómez did not communicate voluntarily with the Rochester staff unless she was under pressure or urgently needed something, that she missed conference calls with ROI's central staff and that Ms. Gómez was difficult to get in touch with and, at times, unreachable.

> problem for the project--this is the essence
> of accountability and trust building.  Jay is
> the Developer of Record for all of the Puerto
> Rico Projects and must be consulted whenever
> problems arise--even if you think you can
> resolve it you must communicate it to him
> immediately.  If he is unavailable you call
> Keith or Stuart.  If the issue is related to
> homeownership you would call Jean Lipani.

Id.  The Notice also informed Ms. Gómez that her job description would be changed "to more accurately reflect [her] key areas of responsibility," and her job title would "be changed to Director of Community Development, Puerto Rico."  Id.  Ms. Gómez's salary was not affected by either change.

On March 14, 2005, ROI hired Hernandez as Director of Housing Development for Puerto Rico.  In this position, Hernandez assumed much of the responsibility for real estate projects that previously had been handled by Ms. Gómez; Hernandez also reported directly to Jay Golden, ROI's Senior Director for Real Estate Development.  Ms. Gómez was upset that Hernandez was not going to report to her.

Shortly after Hernandez was hired, Ms. Gómez visited a psychiatrist, Dr. Jose A. Nunez, because she felt desperate and harassed by ROI.  She attributed her anxiety to the Rochester meeting, but did not know if her condition also might be related to a family history of mental illness.  The following day, Ms. Gómez requested a leave of absence for two weeks due to severe depression.  Mitchell told Ms. Gómez to do whatever she needed to

do in order to maintain her health.  Elizabeth Scott, ROI's Benefits Administrator, sent Ms. Gómez paperwork to begin a disability claim related to her depression.

Later in March, Ms. Gómez traveled to New Jersey to take care of an emergency situation with her daughter.  Her daughter's condition delayed Ms. Gómez's own recovery.  As a result, Ms. Gómez's physician increased her dosage of medication and initially extended her rest period until April 18, 2005, and later to May 12, 2005.

Dr. Nunez completed the physician's section of Ms. Gómez's disability form on April 4, 2005.  He indicated that Ms. Gómez's depression was work-related.  On the basis of this assessment, Guardian Life Insurance Company ("Guardian"), ROI's disability insurance provider, denied Ms. Gómez's disability claim. When Scott received the denial from Guardian, she informed Ms. Gómez that, because her disability was work-related, her claim had to be processed through Puerto Rico's State Insurance Fund ("SIF") for worker's compensation.

After being notified of the denial of her claim, Ms. Gómez sent a letter to Mary Hanson, the Senior Vice-President of Human Resources for ROI.  In this letter, Ms. Gómez articulated, for the first time, that she believed that she has been subjected to sex and age discrimination.  Specifically, she stated:

> I had initiated the recruitment process for a
> developer a couple of months before and I had

> a pool of candidates and an agreed Job Description. I had interviewed the person hired before my visit to Rochester, and though he honestly admitted not having substantial development experience in New York and no knowledge of the processes in Puerto Rico, I recommended him because he had enough background to accomplish what the original intention of that position was under my supervision and responsibility.
>
> As it turns out, the developer was hired by Rochester staff in substitution of myself and not as an assistant but as a "peer" Director. His recruitment letter states clearly that I was to "transition out" of development and assist in administrative matters while he retains all responsibilities and duties related to development, including searching for new opportunities.
>
> Relieving me of the most important of the responsibilities that I had, and not allowing me to supervise this staff person is humiliating. Due to the fact that this person accepts not having the development expertise or the knowledge of the Puerto Rico market and its housing development industry, the only conclusion that I can reach for being substituted is that I am being discriminated due to gender and age.

App.312-13.

In addition to filing her internal complaint of discrimination, Ms. Gómez pursued the disability claim, related to her depression, with the SIF. In her claim, she identified the Rochester meeting as the source of her work-related depression.

On May 3, Ms. Gómez sent an email to Hanson and others at ROI stating that she had visited the SIF, which had notified her that she could not return to work until it had concluded the

investigation of her claim. Ms. Gómez informed ROI that she could not afford to continue without her regular income and had decided to withdraw her claim. She indicated that she would return to work on May 12, 2005. Hanson responded that the SIF "is now in control" of the claim and informed Ms. Gómez that she needed to obtain and submit a medical release prior to returning to work. App.319. On May 11, 2005, Hanson reminded Ms. Gómez that, prior to returning to work, she would need a release from her doctor and the SIF's clearance stating that her case was withdrawn.[2]

On May 12, 2005, while Ms. Gómez was on medical leave related to her depression, she suffered a setback related to her back condition. Ms. Gómez informed Scott that, as a result of this condition, she would not be able to return to work until June 5, 2005. Ms. Gómez also completed a claim for disability benefits through Guardian, and, on May 27, 2005, ROI sent a letter to Guardian submitting Ms. Gómez's new claim. On May 31, 2005, ROI updated Ms. Gómez on her new disability claim and informed her that Guardian would not approve the new claim because she was currently on worker's compensation leave.

On June 9, 2005, while Ms. Gómez's worker's compensation claim still was pending, she informed Mitchell that, although the crisis with her back condition had been stabilized,

---

[2] The SIF finally issued a notification that the claim had been withdrawn on July 15, 2005.

- 9 -

I still cannot conduct long drives within a period of three months specially [sic], in the types of roads that comprise our service area. As per the agreements made upon my recruitment with ROI, I request reasonable accommodation during such period. I can work the first 2-3 weeks from home, and then I can travel one way and stay in Adjuntas (as before), then I can travel back another day. I can attend project meetings with Roger.

App.478. Hanson responded to Ms. Gómez's request accordingly:

Regarding your request included in a letter to Stuart Mitchell dated June 9, 2005, you are requesting that you be allowed to work out of your home for three weeks and then to drive to the service area one day per week. At this time I am advised by housing management that this is not programmatically justifiable. If your neurologist is stating you cannot drive long distances for three months then we must follow that advice. However, we are willing to discuss with you and consider other possibilities of reasonable accommodation. With this in mind, please let us know any other ideas, requests, and/or suggestions you may have along the lines of reasonable accommodation which you feel will make it possible for you to perform the essential elements of your job in spite of the conditions which you are telling us that you have. We will consider them and respond to you.

App.542.

While Ms. Gómez was on leave, various projects had to be taken over by other staff members. At this time, ROI discovered that, contrary to ROI policy and specific directions given to Ms. Gómez, Ms. Gómez had "established an unauthorized checking bank account apparently for the purpose of avoiding use of the ROI financial system for receipt of donations to the corporation and

processing payments." Id. Hanson sent a letter to Ms. Gómez informing her that, "[i]f true, this would be a serious breach of authority" and that "[ROI] intend[ed] to investigate fully." Id. In the same letter, ROI asked Ms. Gómez to explain "in writing the purpose for this account at Banco Popular and if there exist any other accounts unknown to our Chief Financial Officer that you established." Id.

ROI's investigation of this situation revealed that an affiliate of ROI, Rural Opportunities of Puerto Rico, Inc. ("ROPRI"), with Ms. Gómez's knowledge and participation, had opened an island-based bank account. Prior to this action, Ms. Gómez had received instructions that ROPRI could not have an island-based bank account because ROI's financial processes were regulated strictly by federal and state law. Ms. Gómez did not deny her involvement in the opening of the bank account or in the depositing of funds into that account. Consequently, Ms. Gómez was informed on August 5, 2005, that her employment was terminated. Specifically, the termination letter stated:

> It is evident to ROI management that you established this account, and failed to disclose it, to avoid the ROI financial accounting system. Both of your supervisors, Lee Beaulac and Keith Scholes[,] state that on more than one occasion, when you would raise the subject with them, they specifically instructed you not to establish an Island based checking account. Once again, you refused to follow specific directions.
>
> Given this serious breach of procedure and

> your failure to in any way respond to our request for an explanation or to disclose any rationale for your actions, we have no option but to assume that you have no valid or acceptable explanation for creating the account and diverting funds made payable to ROI. In combination with the numerous other performance issues we have previously detailed, I find you[r] performance unacceptable, in violation of several policies and warranting immediate termination. Accordingly, we have no[] alternative but to terminate you effective the date of this letter.

App.481.

## B.  District Court Proceedings

Ms. Gómez then brought this action, alleging that ROI had discriminated against her on the basis of her gender, age and disability, had terminated her employment on these bases, and had violated ERISA by denying her benefits.  She and her husband also brought state-law wrongful termination and damages claims.

ROI moved for summary judgment with respect to the discrimination claims on the ground that Ms. Gómez was not meeting ROI's legitimate expectations, and, therefore, she could not establish a prima facie case of discrimination.  In the alternative, ROI maintained that Ms. Gómez could not show that the nondiscriminatory reason for her termination was pretextual. Turning to the ERISA claim, ROI argued that Ms. Gómez had not established that ROI was a plan fiduciary and, therefore, had not established that ROI could be held liable for failure to provide

benefits under ERISA.

The district court was persuaded by ROI's arguments and entered summary judgment on its behalf with respect to all of the federal claims.[3]  It then dismissed, without prejudice, the

---

[3]  In conjunction with its motion for summary judgment, and as required by rule, ROI submitted a statement of uncontested material facts.  Ms. Gómez filed a response to ROI's statement of uncontested material facts, which ROI moved to strike on the ground that a number of Ms. Gómez's responses "were denied or qualified by plaintiff's [sic] through conclusory allegations, inadmissible evidence (hearsay), speculation, insult, argumentation, incomplete statements and/or citations, and unsupported facts without appropriate reference to adequate record material." App.618.  The district court agreed with ROI:

> After conducting a thorough review of plaintiffs' response to defendant's statement of uncontested material facts (**Docket No. 38**), the court finds that plaintiff failed to properly contest the vast majority of defendant's statements of fact.  Plaintiffs' denials and qualifications are either irrelevant to the matter at hand, add facts that should have been filed in a separate statement, or consist of mere "speculation, generalities, conclusory assertions, improbable inferences, and, for lack of a better phrase, a lot of 'hot air.'" Dominguez v. Eli Lilly and Co., 958 F. Supp. 721, 7[2]8 (D.P.R. 1997).  Consequently, the court will cull most of the relevant facts from defendant's statement.

Gómez-González v. Rural Opportunities, Inc., 658 F. Supp. 2d 325, 328 n.2 (D.P.R. 2009).
  In her statement of issues to this court, Ms. Gómez does not claim that the district court's ruling was in error or constituted an abuse of discretion. Appellants' Br. 8-9.  Ms. Gómez also does not argue, at any point in her brief, that the district court's characterization of her response, as a whole, is incorrect.
  With respect to one piece of evidence, see infra pp.23-24, which Ms. Gómez tacitly admits "was not properly authenticated," she argues that, "in fairness and pursuant to the spirit of Federal Rule[] of Evidence 102, it should have been

plaintiffs' pendent state claims.

## II

## DISCUSSION

## A. Discriminatory Discharge Claims

Ms. Gómez first claims that the district court erred in granting summary judgment in favor of ROI on her discriminatory discharge claim. To set forth a prima facie case of gender-based discriminatory discharge under Title VII, "the plaintiff must show that (1) she was within a protected class, (2) [she] possessed the necessary qualifications and adequately performed her job, (3) but was nevertheless dismissed and (4) her employer sought someone of roughly equivalent qualifications to perform substantially the same work." Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d

---

considered, or at the least Appellant be allowed to authenticate said document, **in order to ascertain the truth.**" Appellant's Br. 18, n.3. We disagree. We have stated that, "[i]n opposing a motion for summary judgment, a plaintiff must proffer admissible evidence that could be accepted by a rational trier of fact as sufficient to establish the necessary proposition." Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 475-76 (1st Cir. 2002). Ms. Gómez does not allege that she had insufficient time to respond to the motion for summary judgment at the district court, nor did she make any effort, after the issue of authentication (among others) had been raised by ROI, to provide the district court with proof of authenticity. In short, she has not provided us with any basis on which to conclude that the district court abused its discretion in issuing its ruling. See Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 218-19 (1st Cir. 2007) (reviewing for an abuse of discretion the district court's order "deeming appellee's statement of uncontested facts . . . admitted"). Consequently, we shall not disturb the district court's ruling.

52, 58 (1st Cir. 2005).  The formulation for establishing a prima facie case of age-based termination under the ADEA is only slightly different:  The plaintiff must establish that (1) she was at least forty years old; (2) she was qualified for the position she had held; (3) she was fired; and (4) "the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services."  Vélez v. Thermo King de P. R., Inc., 585 F.3d 441, 447 (1st Cir. 2009).  If a plaintiff establishes a prima facie case of discrimination (based on sex or age), the burden of production shifts to the employer to come forward with a legitimate, nondiscriminatory reason for its action.  Id.  "If the employer does so, the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory."  Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010).

Although the parties dispute whether Ms. Gómez can establish a prima facie case of age or sex discrimination, their primary focus is on whether ROI's grounds for terminating Ms. Gómez's employment--her opening and use of the local ROPRI bank account--were pretextual.  We believe it both expeditious and appropriate under these circumstances to "assume that [Ms. Gómez] has made out a prima facie case in order to move on to the real issues in the case."  García v. Bristol-Myers Squibb Co., 535 F.3d

23, 31 (1st Cir. 2008). Indeed, we have observed that, "[o]n summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996). We turn, therefore, to Ms. Gómez's evidence that ROI's reason for terminating her employment was pretextual.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotation marks and citations omitted). Ms. Gómez argues that it is implausible that the real reason ROI terminated her employment was the opening of the island account because she had no power over the ROPRI board and, therefore, could not prevent this action. However, this fact is largely irrelevant. Ms. Gómez was ROI's liaison to the ROPRI board and was responsible for providing them with assistance. She failed to advise the ROPRI board that its action in opening the island bank account was contrary to ROI's policies. After the

ROPRI board voted to open the account, she failed to apprise ROI headquarters that such a measure had been passed. Finally, Ms. Gómez participated in the opening of the account and directed that donations made to ROI be deposited in that account. She did so knowing that, as an employee of ROI, she was required to adhere to ROI's fiscal policies and procedures.[4]

Ms. Gómez further maintains that ROI has offered differing or shifting justifications for its actions against her, which is sufficient evidence of pretext. See Billings v. Town of Grafton, 515 F.3d 39, 56 (1st Cir. 2008) (holding that "[a]n employer's 'different and arguably inconsistent explanations' for its challenged employment action can serve as evidence of pretext" (quoting Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000))). Specifically, Ms. Gómez argues that the reasons for terminating her employment set forth in the termination letter, signed by Mitchell, differ from the reasons that Mitchell articulated in his deposition. After reviewing the letter and the

---

[4] Similarly, Ms. Gómez argues that the reason for her termination must be pretextual because ROI took pains, subsequent to this issue arising, to have affiliates specifically incorporate, in their by-laws, a prohibition against establishing checking accounts in the affiliates' names. In essence, she claims that, because there was no explicit provision in ROPRI's by-laws prohibiting such an action, her employment was terminated because she violated a nonexistent policy. However, Ms. Gómez was not an employee of ROPRI, but of ROI. Regardless of whether the ROPRI board clearly understood its authority under the by-laws, this evidence does nothing to mitigate Ms. Gómez's participation in the opening of the account and the depositing of funds in that account, in contravention of her employer's fiscal policies.

testimony, however, we conclude that they are entirely consistent with one another. The termination letter is two pages long and discusses, in depth, that Ms. Gómez opened an island account for ROPRI, that she deposited ROI donations into the ROPRI account, that she had been told previously not to open island accounts and that the opening of the account was in serious breach of ROI's fiscal policies. The letter concludes:

> Given this serious breach of procedure and your failure to in any way respond to our request for an explanation or to disclose any rationale for your actions, we have no option but to assume that you have no valid or acceptable explanation for creating the account and diverting funds made payable to ROI. In combination with the numerous other performance issues we have previously detailed, I find you[r] performance unacceptable, in violation of several policies and warranting immediate termination.

App.481. This letter does not conflict in any way with Mitchell's deposition testimony that "the reason" that Ms. Gómez was fired was the opening of the ROPRI bank account. App.456.[5]

Ms. Gómez also points to a number of other pieces of evidence that, she claims, establish that she was performing her job responsibilities to ROI's satisfaction. Because ROI was

---

[5] Mitchell testified accordingly:

Q. She was strictly fired because of the checking account?
A. Yes.
Q. That's the main reason?
A. That's the main reason. That is the reason.

App.456.

satisfied with her performance, she concludes that ROI's decision to terminate her employment must be pretextual. For instance, she points to evidence that ROI initially was supportive of her hiring a Real Estate Development Project Manager to work directly under her supervision, that she was making progress with some of her real estate projects and that she had a "wealth" of real estate experience from which Hernandez could benefit, App.275.

Ms. Gómez's evidence misses the mark. ROI terminated her employment because she committed a serious breach of policy in opening the ROPRI account and depositing ROI funds into that account. Evidence that, prior to this discovery, ROI believed that Ms. Gómez capably could supervise and train an additional employee or that Ms. Gómez was making progress on some projects within the scope of her responsibility, is not inconsistent with, and does not undermine in any way, ROI's stated reason for terminating Ms. Gómez's employment.

Because the evidence proffered by Ms. Gómez does not raise a genuine issue of material fact with respect to pretext, we affirm the district court's grant of summary judgment on Ms. Gómez's discriminatory termination claims.

## B. Reasonable Accommodation

Ms. Gómez next argues that ROI violated the ADA by failing to provide a reasonable accommodation for her back

condition. We have outlined the following elements of a prima facie case of failure to accommodate:

> To survive a motion for summary judgment on a failure-to-accommodate claim, a plaintiff ordinarily must furnish significantly probative evidence that he is a qualified individual with a disability within the meaning of the applicable statute; that he works (or worked) for an employer whom the ADA covers; that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment.

Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999).

The parties do not discuss these elements in detail. Rather, they focus on whether Ms. Gómez's requested accommodation, following the aggravation of her back condition, was reasonable. Ms. Gómez maintains that her request must be considered reasonable because it is identical to the accommodation request that she had made to ROI when she first was hired, and ROI had agreed to the accommodation at that time. Appellants' Br. 32 ("Not only did Appellee renege on the, initially, reasonable accommodation afforded to Appellant, but he ignored and gave a halfhearted excuse that to do so, again, would not be 'programmatically justifiable' (an unexplained concept[)] . . . .").

As a factual matter, however, Ms. Gómez is incorrect. Originally, ROI agreed to allow Ms. Gómez to work from her home a

few days per week and to work out of the Adjuntas office a few days per week.  However, the new accommodation contemplated Ms. Gómez spending only one day per week in Adjuntas and traveling home the following day.[6]  The original accommodation also did not permit Ms. Gómez to work from home for weeks at a time without any travel; however, this was an aspect of Ms. Gómez's later request.

Ms. Gómez bears the burden of proof with respect to the elements of her failure-to-accommodate claim.  <u>Kvorjak</u> v. <u>Maine</u>, 259 F.3d 48, 55 (1st Cir. 2001) ("We recently have confirmed that the plaintiff bears the burden of proposing an accommodation that would enable him to perform his job effectively and is, at least on the face of things, reasonable.  This necessarily entails a showing that the accommodation would effectively enable [him] to perform [his] job." (internal quotation marks and citations omitted) (modifications in original)); <u>Higgins</u>, 194 F.3d at 264 ("To survive a motion for summary judgment on a failure-to-accommodate claim, a plaintiff ordinarily must furnish significantly probative evidence that . . . the employer . . . did not reasonably accommodate [his] limitations . . . .").  Because Ms. Gómez has offered no other argument or evidence as to how the proposed accommodation, which involved her spending significantly less time at the Adjuntas

_____

[6] At least this is how ROI interpreted the request, App.542 ("[Y]ou are requesting that you be allowed to work out of your home for three weeks and then drive to the service area one day per week."), and Ms. Gómez did nothing to correct any misconception.

- 21 -

office, was reasonable, she has failed to meet her burden with respect to her ADA claim.  We therefore affirm the district court's entry of summary judgment for ROI on this claim.

## C.  ERISA Claim

Finally, Ms. Gómez claims that ROI is liable under 29 U.S.C. § 1132(a)(1)(B)[7] because it wrongfully denied her disability claim.  "[T]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan." Terry v. Bayer Corp., 145 F.3d 28, 36 (1st Cir. 1998) (internal quotation marks and citations omitted).  There is an exception to this general rule:  If an entity or person other than the named plan administrator takes on the responsibilities of the administrator, that entity may also be liable for benefits.  Law v. Ernst & Young, 956 F.2d 364, 372-73 (1st Cir. 1992).  However, "the mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary

---

[7]  Section 1132(a)(1) of Title 29 provides in relevant part:

A civil action may be brought--
    (1) by a participant or beneficiary--
        . . .
        (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .

29 U.S.C. § 1132(a)(1)(B).

- 22 -

status." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 18 (1st Cir. 1998); see also Terry, 145 F.3d at 35-36 (quoting a Department of Labor interpretive bulletin for the proposition that "an entity which merely processes claims 'is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan'" (quoting 29 C.F.R. § 2509.75-8, D-2 (1997))).

In this case, ROI established, through the deposition testimony of its benefits administrator, that it received Ms. Gómez's claims for disability benefits, completed the employer portion of the forms and passed on the forms to Guardian, the plan administrator, to determine whether benefits would be paid. Ms. Gómez did not come forward with any evidence that ROI performed anything except ministerial functions in the processing of her disability claims. Consequently, ROI cannot be held liable under ERISA for the denial of Ms. Gómez's disability claims.

Ms. Gómez claims that there is a genuine issue of material fact with respect to her ERISA claim. According to Ms. Gómez, Scott, the ROI Benefits Administrator, "LIED UNDER OATH" when she testified that she had filed the disability claim with Guardian. App.403. As support for this assertion, Ms. Gómez points to an email, which she included in the materials filed in opposition to ROI's motion for summary judgment. The email is dated 3/12/09, purportedly from Marysol Sanquiche, a customer

service representative at Guardian.  The email reads as follows:

> Dear Mr. Erick Morales Perez,
>
> As per our telephone conversation in regards of Mrs. Gómez Gozalez [sic], Myriam S.S # []. We have not received a notice and proof of claim for disability benefits for the above claimant or for this S.S #[] as [of] 03/11/09.
>
> Any further questions feel free to contact our office.

App.494.  This unauthenticated, unsworn document cannot be relied upon to defeat ROI's motion for summary judgment.  We have explained that

> the nonmovant bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." <u>Mulvihill</u> v. <u>Top-Flite Golf Co.</u>, 335 F.3d 15, 19 (1st Cir. 2003).  Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." <u>Vazquez</u> v. <u>Lopez-Rosario</u>, 134 F.3d 28, 33 (1st Cir. 1998). . . .

<u>Noviello</u> v. <u>City of Boston</u>, 398 F.3d 76, 84 (1st Cir. 2005).  The email submitted by Ms. Gómez is not only hearsay, <u>see</u> Fed. R. Evid. 801, 802, but also it is not, on its face, relevant, <u>see</u> Fed. R. Evid. 401, 402, or based on the personal knowledge of the author, <u>see</u> Fed. R. Evid. 602.  The email, therefore, cannot be used to defeat ROI's motion for summary judgment.  <u>Noviello</u>, 398 F.3d at 84.

### Conclusion

Ms. Gómez has failed to come forward with evidence

establishing that her termination was pretextual. Similarly, she has not come forward with evidence establishing that ROI failed to provide her with a reasonable accommodation or that ROI was liable for any denial of disability benefits. We therefore affirm the district court's grant of summary judgment with respect to Ms. Gómez's federal claims.[8]

**AFFIRMED.**

---

[8] As noted previously, the district court dismissed without prejudice Ms. Gómez's pendent state claims. In her brief, Ms. Gómez requested that this court adjudicate her state claims if she were to prevail on appeal with respect to her federal claims. However, she did not allege any error in the district court's dismissal, nor did she make any argument or present any evidence establishing an independent basis for the district court's jurisdiction. Therefore, we also affirm the district court's dismissal without prejudice of Ms. Gómez's state claims.